DAVIS (SACKETT v.). See Case No. 12,203.

DAVIS (SCHUESSLER v.). See Case No. 12,485.

## Case No. 3,650.

### DAVIS et al. v. The SENECA.

[Gilp. 10; 1 U. S. Law Int. 214.][1]

District Court, E. D. Pennsylvania. Dec. 23, 1828.[2]

SHIPPING — DISAGREEMENTS BETWEEN PART OWNERS—POWERS OF ADMIRALTY COURTS.

1. Where one of two part owners, who have equal interests in a vessel, declares his intention of taking her to sea, and offers to make stipulation for her safe return, a court of admiralty will not, on an application of the other part owner, grant a compulsory order of sale, or permit him to send her to sea with a master appointed by himself.

[Approved in Bradshaw v. The Sylph, Case No. 1,791. Cited in Tunno v. The Betsina, Id. 14,236.]

2. The provisions of the French commercial law which authorise a compulsory sale of a vessel, in case of partners disagreeing about the use of her, are to be regarded rather as municipal regulations of that country, than as the general law of admiralty.

3. The English courts of admiralty claim and exercise no power to compel a sale of a vessel, on the application of part owners who object to a contemplated voyage, but they will require stipulations in favour of the dissenting owner of a vessel for her safe return.

[Cited in The Marengo, Case No. 9,066.]

[See note at end of case.]

On the 5th December, 1828, the complainants in this case [Davis and Brooks] filed their petition, setting forth the following facts: That the petitioners are owners of one half part of the brig Seneca, now lying in this port; that the remaining half part belongs to Captain Henry Lovely, who has had possession of the brig for several months, with the sole control of her: that he has proceeded on several voyages to the loss and dissatisfaction of the late owners, from whom the petitioners purchased the brig: that he now threatens to take the vessel to sea without their consent, and to their great detriment: that they have repeatedly offered to sell their share to Captain Lovely at a reasonable price; or to purchase from him; or to sell the entire vessel at public auction; or to send her to sea with a master to be appointed by themselves; but that Captain Lovely obstinately refuses all these propositions, and persists in saying that he will take the brig to sea. The prayer of the petition is for an attachment against the vessel, and a citation to the captain to show cause why the court should not grant an order for the sale of the brig; or why they should not be permitted to send her to sea with a master appointed by themselves. The attachment and citation were awarded.

[1] [Reported by Henry D. Gilpin, Esq. 1 U. S. Law Int. 214, contains only a partial report.]

[2] [Reversed in Case No. 12,670.]

The respondent admits the ownership of the vessel, as stated; that he is in possession of her; that he has taken her on several voyages, and means immediately to take her to sea; and asserts that the petitioners have no remedy or right, but to require of him to give security for her safe return, which he is willing and ready to do. On the 12th December the case came on for hearing before Judge Hopkinson, and was argued by T. I. Wharton for the complainants; and by Mr. Chauncey for the respondent, who agreed to the leading facts set forth in the petition, and submitted to the jurisdiction of the court, but contended that the only remedy for the complainants, was to require of the defendant to give satisfactory security for the return of the vessel.

T. I. Wharton, for complainants.

The complainants have made every effort to obtain a sale of the vessel, having offered to buy or sell at a reasonable price. In such a case the admiralty has a right to order a sale. The complainants and respondent are part owners of the brig: she is now here under the power of the court, and the respondent intends to take her to sea, against the will of his partners. The present application is novel in this court, nor has the question been decided in any court of the United States. It therefore lies upon us to show clearly, first, that this court has the power to grant the prayer of the petition, and to direct the sale of the vessel; secondly, that it has the power to take her out of the hands of the respondent and put her into the hands of the complainants on their giving security; and thirdly, that the facts of this case call for the exercise of this power.

I. To direct a sale. The petitioners have no remedy at common law; no attachment will lie, as the respondent is a resident here; nor can a part owner maintain trover against his partner; nor will a replevin lie. Perhaps in England, chancery would give an injunction; but as we have no court of chancery in Pennsylvania, the reason is the stronger for restoring to the admiralty its old, original jurisdiction. We contend, therefore, on the part of the complainants. 1. That the maritime courts of the continent of Europe have possessed, and still possess this jurisdiction. 2. That the English admiralty possessed it for a long period without dispute, and perhaps still possesses it. 3. That whatever may be the case in England, our courts possess an enlarged maritime jurisdiction, and this case is within it.

1. The germ of the maritime law of all Europe is found in the Roman civil law. It contains provisions on the subject of part owners, that are embodied in the earliest known ordinances. These establish the positions, that if a master who is part owner sells, the other owners may take the shares at a valuation; that where the interest is equally divided one may compel the others to sell; and that if the major part of the owners refuse to fit out a vessel she is to be valued and sold. Laws of the Hanse Towns, art. 56; Ordinances of France, tit. 4, art. 6; French Commercial Code, § 220; 1 Valin, Comm. 584; 1 Molloy de Jure Mar. 311; 2 Browne, Civ. Law, 131, 406; 1 Pet. Adm. cix.; 2 Pet. Adm. xvii., lxvi.

2. Originally the English maritime courts possessed the same powers as those of the rest of Europe, and until the year 1745, no decision is to be found which denied the right of the admiralty to compel a sale by one part owner of a vessel. That decision, in the case of Ouston v. Hebden [1 Wils. 101,] was made before the common law courts had recovered from their horror of the admiralty, which has since greatly passed away. Hall, Adm. viii. xvi. 10, 87; Beawe, Lex Mer. 51; 1 Molloy de Jure Mar. 311; Ouston v. Hebden, supra; De Lovio v. Boit [Case No. 3,776]; Holt, Shipp. 360, 364.

3. Whatever may be the opinions of judges in England, the admiralty has the power here; our courts possess an enlarged admiralty jurisdiction, extending under the third article of the constitution to all cases of admiralty and maritime jurisdiction. The admiralty courts of the United States, therefore, have all the jurisdiction of the English courts at an early period, and all which the continental courts still exercise. The power now claimed is within this, for it was possessed formerly by the English, and is now possessed by the continental courts. The law is the same in France now; admiralty jurisdiction extends over all matters relating to owners of vessels, and in cases where partners differ they are to be settled by the laws of the sea. Judges Story, Winchester and Peters have all held that the admiralty jurisdiction is more extensive here than in England; and even there all the cases, except the single one of Ouston v. Hebden, assert the jurisdiction of the admiralty generally over part owners of a vessel. The jurisdiction over the subject matter implies a right to order a sale; the question is only as to the expediency. Const. U. S. art. 3, § 2; Hall, Adm. xvii.; [McClung v. Ross]·5 Wheat. [18 U. S.] 115, note; De Lovio v. Boit [supra]; Jennings v. Carson [Case No. 7,281]; Gardner v. The New Jersey [Id. 5,233]; Willings v. Blight [Id. 17,765]; 6 Hall, Law J. 557, 576.

II. The court has a right to put the vessel into the hands of the petitioners on their giving security. The same reasoning and authority apply to this point as to the preceding. When the part owners disagree, the court have a right to order the vessel to either. Where one part owner is master, there is a greater reason for giving the vessel to the other part owner. The master, if allowed to take her, may commit barratry, and other frauds, which the other owners cannot; and this the maritime law under-

stands when it provides that owners may dismiss a master on paying him for his share. If this is the maritime law of Europe, as it certainly is, it ought to be the law here. In this case both of the part owners apply to send the vessel out, and if the permission is to be granted to one or the other, it seems more properly to belong to the complainants. 1 Valin, Comm. 572; 1 Pet. Adm. xcix.; 2 Pet. Adm. vi.

III. That the circumstances of the case require the court to grant that petition, is established by the allegations contained in it and not denied by the respondent, as well as by the testimony that has been produced.

Mr. Chauncey, for respondent.

The case is not, that the respondent desires a voyage to which the complainants will not agree, but they would prevent a voyage which the defendant proposes to make. We deny the jurisdiction and power of the court to order the sale; or to take the vessel out of the possession of the respondent, and deliver her to the petitioners. The only remedy for them is to let her go on the proposed voyage and take stipulations for her return. The argument ab inconvenienti, and a failure of remedy at common law, would apply to any other property or chattel as well as to a vessel. This power as now claimed has never been exercised in the United States; nor is properly an admiralty power; it has been frequently repudiated in England in the maritime as well as in the common law courts. The jurisdiction of the admiralty relates to matters happening on the high seas, or in their nature, having reference to the sea; but no law shows that it extends over all ships or all owners of ships. It is true the courts exercise a power over the employment of a ship; but not over the ship itself; or because it is a ship. In relying on the principle of the civil law, that in case of joint ownership of a chattel, the opinion of a majority shall govern, it should be remembered that it is purely one of the civil law, but does not go into the admiralty. So of the French regulations, they are special and part of their civil law, not that of admiralty. They are founded on a positive enactment or provision of their code, and not on the principles of the admiralty law. The only principle borrowed by the admiralty from the civil law is that a majority shall govern. Formerly one part owner could not sell his share, without the consent of the other, until the ship had made a voyage, with other restrictions and limitations. 2 Browne, Civ. Law, 34; De Lovio v. Boit [supra]. There is no such principle as that the admiralty has the power of sale. If there be a majority they prevail; if not, then the right is with those in possession, or who desire to send her to sea. In the latter case the opinion favourable to occupation ought to prevail. The ordinance of Louis XIV. introduced a new principle into the civil

law of France. That a majority of part owners shall give the law, is the general principle of the civil law of chattels; but the right of sale, on an application of a moiety of the interest is not a principle of the civil law. It is a positive enactment of the French code; and the manner in which a public sale may be demanded, is expressly provided for. It becomes a right when demanded by a moiety. The authorities since that have been cited, show no such principle as that contended for, nor any power of sale, except in the case of a majority. None show that in case of equal owners differing as to the employment of a vessel, one may demand a sale; a ship is upon the same footing with other chattels, except as to her employment; and why should she be taken out of the possession of one owner to be delivered to another, holding the same interest in her? The complainants propose to take the vessel and give us security; why should they not leave us the vessel and take our security? Laws of the Hanse Towns, art. 59; Usages of the Sea, 178; Laws of Wisbuy, arts. 64–66; 1 Valin, Comm. 584; Ordon. of Louis XIV. tit. 4, art. 5; 1 Boulaypaty, 339; 1 Moll. bk. 2, c. 1, § 3; Beawe's Lex Mer. 51; 1 Holt, Shipp. 363; The Apollo, 1 Hagg. Adm. 306; Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611; Clinton v. The Hannah [Case No. 2,898]; Shrewsbury v. The Two Friends [Id. 12,819].

T. I. Wharton, for complainants in reply.

By maritime causes are understood persons or things belonging to the sea. Hall, Adm. 12; The General Smith, 4 Wheat. [17 U. S.] 442; Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611, 640; [McClung v. Ross] 5 Wheat. [18 U. S.] 115, note. The case is of the first impression here; it asks for the exercise of a power which no case has shown that the English admiralty courts have ever disavowed. The French ordinances and the commercial code are evidences of the general law, rather than municipal regulations; and though we admit that the provision contended for is not found in terms, any where but in the French ordinances and code, yet we have endeavoured to show that it is a principle, not a mere arbitrary enactment. In regard to the English authorities cited, it is to be remembered that they refer to a restrained jurisdiction; ours is one expressly enlarged by the constitution; but in fact, except the case of Ouston v. Hebden [supra], the peculiar feature of which has been noticed, there is no one denying the power of which we ask the exercise. As to the two American cases they were both decided previously to the present constitution, and under the peculiar enactments of the state laws. In regard to the relative superiority of the claims of the parties, it may be sufficient to say that the possession on which the respondent rests is that of master; of an agent, not a part owner.

HOPKINSON, District Judge. When a cause is to be decided, which involves in it an important and extensive principle of jurisprudence, it is a great satisfaction to the judge to feel assured that he has been furnished with all the aid that professional knowledge and industry can afford. In this case no pains have been spared to elucidate the subject, by researches into the learning of the past as well as the present age; and I regret that the urgency, which calls for a speedy decision, has prevented that critical examination of some of the books referred to, in foreign languages, which I should have made, if more time could have been taken for it. I do not, however, come to the decision of the case, without a careful and sufficient acquaintance with the authorities cited. The petition is filed by Davis and Brooks, merchants of the city of New York, who state that they are owners of one-half of the brig Seneca, now lying in the port of Philadelphia, and that the remaining half part belongs to Captain Henry Levely. That Captain Levely has had possession of the brig for several months, having the sole control thereof; and has proceeded on certain voyages to the detriment and dissatisfaction of the late part owners, (from whom the brig was purchased by the complainants,) and now again threatens to take the vessel to sea without their consent, and to their great detriment. They go on to state, that, finding themselves in a very inconvenient situation by the conduct of Captain Levely, they have repeatedly offered to sell their share to him at a reasonable price; or to purchase his share on sufficient terms; or to sell the entire vessel at a public sale; or to send her to sea with a master appointed by themselves; but that the said Captain Levely has obstinately refused to adopt either of these courses, and persists in declaring that he will take the vessel to sea. The complainants, in consideration of these circumstances, pray for an attachment against the brig, and a citation to Captain Levely to show why the court should not grant an order for the sale of the said vessel, or why they should not be permitted to send her to sea with a master appointed by themselves. The attachment and citation were granted; and the case has been argued on the two remaining prayers of the petition. The respondent admits the ownership of the vessel as stated in the petition; that he is in the sole possession of her; that he has heretofore proceeded in her on certain voyages; and that it is his intention immediately to take her to sea; but he denies that this case affords the court any jurisdiction, either to order a sale of the vessel, or to take her out of his possession; and he asserts that the only right and remedy of the petitioners are, to require of him to give them the usual security for the safe return of the vessel, before he takes her to sea against their consent, which he is willing and ready to do.

The counsel of the complainants has taken a very wide range over the ancient and modern powers of the admiralty, in England and on the continent of Europe, to establish the right of this court to order the sale of a vessel in cases of partners disagreeing about the use of her; and the respondent has peremptorily denied the jurisdiction of the court to compel a sale for any such reason, under any circumstances. It is for me only to decide the case presented to me; which seems not to call for the adoption of doctrines so broad and universal as those which have been spread in the argument. I am not now required to give an opinion upon an abstract question of law; nor to say whether a case may not occur or be imagined, in which the admiralty might direct the sale of a vessel, held under its jurisdiction, either as a direct or incidental power. My inquiries will be limited by the case of the complainants, and their right to the remedies they pray for. The parties in this transaction are truly placed in a most inconvenient position; but it results from the inevitable consequences of the contract they have made with each other. While the law would not impose injustice, or injury upon any one, it cannot undertake to save men from all the losses and inconveniences to which they may be exposed, in the connections they form in business or friendship; from the responsibilities and dangers they may incur in their various relations in society. The hardship of this case, on whichever side it may fall, is no ground of complaint against the law, which gives all the protection it can, but cannot always preserve men against themselves and their own acts. In the connections they form, they can, in many cases, have no other security than the discretion and good faith of those in whom they confide, and to whom they commit themselves.

The complainants have insisted, in support of their claim for an order of sale, on the following points:

I. That the maritime courts of the continent of Europe have possessed and still possess this jurisdiction. The direct authorities relied upon for the support of this doctrine, may be resolved into the passages cited from Mo loy, and the sixth article of the second book, title eighth of the French Ordinances with the commentary of Valin (page 584). Browne's Civil and Admiralty Law, Beawe's Lex Mercatoria, and other books have been referred to, but they merely repeat the paragraphs of Molloy, without any additional authority. Other authors cited, of an older date, speak only in general terms of the extent of the admiralty jurisdiction, without specifying the case now under consideration. In examining, therefore, the passages of Molloy, and the pages of Valin, we shall probably omit nothing material to this first point. As to Molloy, I am compelled to say, that it appears to me that this learned and respected jurist has involved himself, or at least his reader, in

some confusion and uncertainty on this subject. In book second, chapter first (page 219), after giving us the sentiments often referred to by subsequent writers, that "ships were invented for use and profit, not for pleasure and delight; to plough the seas, not to lie by the walls," he adds, that "therefore the major part of the owners may, even against the consent, but not without the privity and knowledge of the rest, freight out their vessel to sea." Here the principle is announced, which is now adopted and acted upon in the admiralty of England and this country, as well as of the continent; requiring, however, security, for the dissenting owners, for the return of the vessel. He proceeds: "If a major part," and here he refers to numbers, "protest against the voyage, and but one is left that is for the voyage, yet the same may be effected by that party, especially if there be equality in partnership;" by which, I understand, he means to say, referring not to numbers but to interest, if the one dissentient owns as much of the vessel as all the others. The word "especially" would leave us in uncertainty as to what may be done in cases, where a majority in interest are opposed to the voyage, if another passage did not explain it. In a subsequent page he tells us, that "if it should fall out that the major part of the owners refuse to set out the vessel to sea, then, by reason of the inequality, they may not be compelled; but then such vessel is to be valued and sold." We seem now to have two cases provided for; the first, of an equality of interest in the ownership, between those in favour and those against the voyage, in which case it may be effected even by a minority of numbers; and the second, of a majority in interest opposed to the voyage, in which case the voyage may not be effected, but the vessel shall be valued and sold. So far we would charge the author only with the want of a lucid and precise explanation of his meaning. But what shall we say of the following paragraph: "If it falls out that one," without stating his proportion of interest, "is so obstinate that his consent cannot be had, yet the law will enforce him either to hold or sell his proportion." Now that he must ho'd or sell is an inevitable alternative in every case, and requires no enforcement of the law. It is probably intended, that the law will put him to his election, "but if he will set no price, the rest may out-rig her at their own cost and charges." Is this to be the course in every case, when one withholds his consent to a voyage, without regard to the quantity of his interest, whether more or less, or equal to the others, for no such distinction is noticed? I would presume that the one partner refusing, must be inferior in interest, as well as numbers, to his copartners; but there is a perplexing obscurity in all that this writer has said upon the subject. The interpretation of all the passages may be this. If there is an equality of owner-

ship, the voyage is to proceed: but why "especially"? If there is a majority against the voyage, the vessel is to be valued and sold. If the majority is in favour of the voyage they may fit her out at their own charge; having reference in every case to the interest. How shall we apply the doctrines of this authority, as we understand them, to the case before us? It is not a case of a majority, in number or value, desiring to send the vessel, and opposed by the minority; but of an equality of interest, one insisting on sending her to sea, the other objecting, and in such case, says Molloy, the voyage "may be effected" by the party who would employ the vessel. It is not asserted, by the authority, that in this case, an order of sale would be granted, because it falls within the more convenient remedy of "effecting the voyage," under proper responsibilities to those who object to it. The compulsory sale is resorted to only when the majority object to the employment of the vessel, and may not therefore be compelled to undertake it; and then, in order that the ship, in which the public commerce claims an interest, may not be lost and "lie by the walls," the court, on motives of public policy, and not to cure improvident contracts, or serve individual convenience or interests, assumes the high authority of forcing a man to a sale of his property against his consent, at a price not under his control.

It will here be observed, that I consider this to be a case in which the dissenting owners "protest against the voyage," but propose no other employment of the vessel. It is true, the complainants say that they have offered to send her to sea, with a master to be appointed by themselves; which is imposing a condition on the other owner, unjust and unreasonable, and not to be affirmed by the court, if it had the power to do so. It cannot be held to be a case of mere difference between the part owners about the voyage to be undertaken. The case now to be decided does not appear to me to be such as, even under the doctrines of Molloy, would authorise the court to order a sale of the vessel; and if it were so, I should hesitate to assume a power never exercised by any court of admiralty in the United States or in Europe, on an authority so deficient in precision and perspicuity. The sixth article, cited and commented upon by Valin (page 584), may be thus translated: "No one can compel his partner to proceed to the public sale of a vessel held in common, unless opinions be equally divided about the undertaking of some voyage," or "of any voyage." I would not appear to be fastidiously critical, but am constrained to say, that this article is not to my mind clear of ambiguity. Is it absolutely clear, whether by the exception, "unless opinions be equally divided about undertaking (quelque) some or any voyage," we are to understand that the sale may be compelled, when the partners differ about

some particular voyage proposed by part of them, while the other part propose another, differing therefore about some voyage, that is, about which shall be undertaken? Or does it mean that the sale shall take place, when the parties differ about undertaking any voyage at all: one proposing to send the vessel to sea, and the other to keep her at home? The commentary of Valin gives us his understanding of the text, which is, that the right of compelling a sale exists in two cases: First, when the partners differ about the particular voyage to be undertaken, both, however, desiring to employ the vessel; and, secondly, when the objecting party does not propose any voyage as a substitute for that he opposes, but offers plausible reasons for his opposition. This is very reasonable, but no clue to it is to be found in the text of the ordinance.

The cases, in which a difference among partners on this subject may happen, seem to be: 1. When one partner proposes a voyage, and the other refuses his assent to it, but neither proposes another, nor gives good reasons for his refusal. In this case, the exception of the ordinance, which implies the power to force a sale, has no application, and the dissenting owner cannot be so constrained; because, the public commercial policy, looking only to the employment of the ship, does not require it, inasmuch as the willing partner may send her to sea, on giving security to the other owner for her safe return. 2. When both owners are desirous of employing the ship, but cannot agree about the voyage; then, as neither comes under the interdiction of wishing to keep her, "to lie by the walls," the power to order a sale is brought in, to settle the difference and save the property to both of the parties, as well as for the public use. The commentator truly remarks, that, "under such circumstances, the court cannot take cognisance of the subject of dispute;" that is, cannot decide in favour of one or the other voyage, and pronounce which would be most beneficial and prudent, and ought to be preferred; therefore, in the language of Valin, "there is naturally no other mode of putting an end to the dispute or difference of opinion." 3. When the dissenting partner does not propose another voyage, but offers good reasons for objecting to that proposed: here, under Valin's construction of the ordinance, a sale will be ordered for similar reasons to those above given. The court will not send the vessel to sea against the consent of an owner, who "sustains his dissent by plausible reasons;" nor will it deprive the other owner and the public of her use, by keeping her unemployed, on a difference of opinion, which they cannot settle, and may be endless. The court, therefore, from a sort of necessity, cuts the knot by dissolving an injurious and embarrassing connection.

Does the case of the complainants fall within the power of ordering a sale, as given by this ordinance, explained, as it is, by the commentator, with a very large and liberal interpretation? They propose no voyage as a substitute for that they object to; for, I repeat, I cannot consider their offer to send the brig to sea, on condition that they shall have the exclusive appointment of the master, to be such a proposal as should be regarded on this question; no intimation is given of when or where they would send her; no voyage designated. The remaining case of Valin is, where the dissenting owner offers plausible reasons for objecting to the voyage proposed. The objection of the complainants, as stated in their petition, and offered to be more circumstantially proved, is not to the particular voyage on which this vessel is about to be sent, as being unprofitable or hazardous, but to her going any where in the possession and under the command and control of the defendant. We fall here into another ambiguity or difficulty in the meaning of the commentator. Must we take him literally that the objection must be made to the voyage in question? Or may it be extended to the master, the mariners, the condition of the vessel, in short to any thing in relation to the vessel or voyage? I shall offer no opinion upon this question of construction, because, taking the commentary in its most enlarged sense, I should not feel myself to be bound by it, or authorised to adopt it as the law of this court, unless, on another point of this case, I shall find it to have been extended to this country. At present I consider it as a local municipal regulation of the country enacting it, and partaking, more or less, of the general jurisprudence and policy of that country. If, then, the objections or reasons, set up by the complainants, as the ground of their application to the power of the court, are not of the description alluded to by Valin, they stand in the third position of an owner dissenting to an intended voyage, but neither proposing another, nor "offering plausible reasons" for his dissent; and, in such case, his remedy is not by forcing a sale of the vessel, but by requiring security for her safe return.

II. The second point made for the petitioners, on the question of sale, is that the English courts of admiralty possessed this power for a long period, and, perhaps, still possess it. On the first branch of this point, that the English courts once possessed this power, no authority has been produced beyond very general expositions of admiralty jurisdiction. Molloy does not propose, in his treatise, to give the law of England on admiralty jurisdiction, on the contested questions in relation to it. He expressly disavows it, saying, "In the whole work I have no where meddled with the admiralty or its jurisdiction (unless, by the by, as incidentally falling in with other matter) knowing it would have been impertinent and saucy in me to enter into the debate." Judge Story in the case of De Lovio v. Bolt [Case No.

3,776], says: "What was originally the nature and extent of the jurisdiction of the admiralty cannot now with absolute certainty be known." I assuredly will not attempt to illustrate what was hidden from him; nor do I think that a knowledge of what was the constitution of this court, centuries ago, under all the changes that have taken place in commerce, national intercourse, and municipal jurisprudence, should govern us at this day. Whether the power now claimed for the admiralty was formerly possessed by that court in England or not, I must leave in the uncertainty and obscurity in which ages of darkness have involved it; but it seems to me to be sufficiently clear, that the suggestion that the admiralty in England still possesses it, is altogether without foundation. The Case of Ouston v. Hebden, 1 Wils. 101, is full and direct to the point, that the admiralty has no power to compel a sale of a ship, on the application of a part owner who objects to a contemplated voyage. It may compel security to be given to the dissenting owners, but cannot force a sale upon them, or require of them to buy the shares of the others. I have not found any disapprobation of this doctrine, either by the court of admiralty or by any English writer on the civil and admiralty law; on the contrary Brown, no mean advocate for admiralty jurisdiction, gives the case of Ouston v. Hebden in his well known work, without any kind of disapprobation. Lord Stowell, in the case of The Apollo, 1 Hagg. Adm. 306, after stating the right of requiring stipulations, in favour of the dissenting owner of a ship, for her safe return, adds: "There is no case, either within the scope of my own inquiry, or which has been discovered by the diligence of the advocates, upon repeated challenges given them for that purpose, in which the court has moved beyond these limits." I feel therefore fully warranted in saying that a court of admiralty in England does not possess or claim the power now contended for.

III. But if the complainants are right in their third point, they must prevail; to wit, that whatever may be the case in England, our courts hold an enlarged maritime jurisdiction; and with it, the power now asked to be exercised. The proposition, that the admiralty powers are or ought to be more enlarged in this country than in England, is too general to bring us to the specified conclusion now required; it should be further shown that the enlargement comprehends the power in question. The general ground is a good foundation to build upon, but the materials of the fabric must be obtained from established principles and precedents. In the first place it is not pretended, that this power has ever been exercised or directly asserted by any court of admiralty in the United States. When I am called upon to wield a power never before used, or directly claimed by any court of admiralty, in England or in our own country, the right should be made exceedingly clear, from acknowledged principles and unquestionable deductions; and if any difference exists between the law of the United States and that of England, on the subject, arising from the nature of our political or judicial institutions, it should be brought home to the question, before the court can presume to add such a power to its jurisdiction. The courts of admiralty in England may have been, at one period, too much constrained by the watchful and rigorous jealousy of the common law, but, on the other hand the civilians have not been without ambition to extend their dominion; and, having the field very much to themselves on the continent, they may draw us over a wide range, if we follow them implicitly. By hastily disregarding the doctrines of the English courts, in favour of the apparent convenience of the civil law, we shall disturb the harmony of our system of jurisprudence, which has been essentially derived from that of England, and follows it in its leading arrangements. Let us be governed by a sincere desire to direct and regulate both jurisdictions by the great ends of public convenience, and individual justice, without rashly removing established limits and landmarks. How have the complainants proved that the admiralty courts of this country possess a jurisdiction so enlarged as to embrace the power, now expected to be used in their behalf? They have not shown any actual exercise of such a power, nor any assertion of it, but have endeavoured to deduce it from some general observations made by most respectable judges; to wit, Judges Story, Peters and Winchester. If, indeed, such names shall be found to support their pretensions, they will be strongly fortified.

The general expressions of Judge Peters, in the case of Jennings v. Carson [Case No. 7,281], that, "acting in a national, and not a dependent capacity, I cannot conceive that we are bound to follow the practice in England, more than that of our own, or any other nation," furnish nothing by which we can obtain the least hint of his opinion upon our question. In the case of Willings v. Blight [Id. 17,765], a petition was preferred to permit the majority of owners to proceed with the brig Amelia on a certain voyage, after giving stipulation for the value of the recusant owner's share. The court clearly thought the case was one of admiralty jurisdiction. It is stated that the recusant owner would neither sell at a reasonable appraisement, nor make advances for the outfit. The judge says that, "whether a minority (the case of equality is not given) shall or shall not be compelled to sell, has not been here judicially decided." He then quotes passages already noticed, from Molloy, taking them from the Treatise on Sea Laws and Beawe's Lex Mercatoria, into which work they are carried from Molloy. The judge, however, is so far from intimating an opinion that a compulsory sale is the proper remedy for the

obstinacy of a recusant part owner of a ship, that, in conclusion, he says, "a privation of freight, the fruit and crop of shipping, seems therefore to be an appropriate mulct on indolent, perverse or negligent part owners." He adverts to no distinction of majorities or minorities. Nor can I discover in the laborious and learned investigation of admiralty jurisdiction, by Judge Winchester, in the case of Stevens v. The Sandwich [Id. 13,409], any thing which warrants us in concluding that he maintained that jurisdiction to the extent now claimed. He says that "a dispute between part owners, whether a ship shall be sent to sea, is cognisable in the admiralty;" and assuredly so it is, but the manner in which the court may interfere in such case, is not suggested by the judge; and we must suppose he alludes to the usual and unquestioned mode of demanding security for those who dissent. The subsequent general view of admiralty jurisdiction, and the matters subject to it, are equally unsatisfactory to guide us to his opinion on the particular point here in dispute.

To show the approbation of Judge Story, of the doctrines of the counsel for the complainants, we are referred to his celebrated opinion in the case of De Lovio v. Boit [supra]. I have carefully perused this profound and extensive investigation of the nature and extent of the admiralty rights and powers, which is certainly conducted with the most liberal disposition towards them, but I have seen nothing in it from which I can conclude, with the counsel for the complainants, that if this application were made to that learned judge, he would not hesitate to grant the prayer of the petition. In page 463 of that case, Judge Story says, that the admiralty exercises undisturbed jurisdiction, and entertains suits, first, for possession of ships, and, secondly, upon controversies among part owners as to the employment of ships. The distinction taken by the counsel of the respondent is here recognised. No intimation is given of any power in the admiralty to take a ship from one owner and deliver her to another; nor to compel an unwilling partner to sell his share at an appraisement to be made by others. The court will take care that she shall be employed, and when the party desirous of employing her offers to his associate the usual security, both the policy of the law and the interest of the individual are sufficiently guarded and protected. I must confess that I do not see how this policy or this question can be affected by majorities or minorities of ownership, except so far as they may influence the judgment and discretion of the court in the exercise of its power. The doctrine of Valin is, that where there is a majority against the voyage, it shall not proceed by reason of the respect paid to the majority; and yet this majority are to be made to submit to the stronger compulsion of a forced sale of their interest. The reason, which is the foundation of this extraordinary interference of the court, applicable to no other joint property but ships, is, to prevent the obstruction of commerce and navigation, in which the whole community have an interest; but this reason cannot be applied to a case like the present, where the whole dispute between the owners is for the possession of the vessel, and the party actually in possession desires to send her to sea, and is willing to secure the rights of his associate. On what principle can we compel a sale of the vessel in such a case, even if it were admitted that, abstractedly, the power exists in the admiralty? Too much time has already been occupied by me, on this occasion, or it might have been useful to have examined the various parts of Judge Story's opinion, which have been supposed to support the present application. It is not necessary, or I should not have omitted it, however prolix. The judge certainly does reject decidedly, in which I concur with him, any binding authority of the common law decisions in England upon this subject. I agree with him that "we are at liberty to re-examine the doctrines, and to construe the jurisdiction of the admiralty, upon enlarged and liberal principles." But we are not to conclude from this, that we are to set no limits to it; or that we may do, under it, any thing that may seem to be convenient in any paticular case; nor yet that we should not cautiously respect the English decisions by great and learned men, tainted perhaps, but not blended or corrupted, by prejudice. We must look to established principles and precedents to guide us, and when the wisdom and experience of legislators and jurists have found it good and expedient for the public convenience, and the due administration of justice, to establish different tribunals for different subjects of controversy, giving to each its boundaries; it is the duty of those, who are called upon to administer the law, to do it in the manner prescribed to them; to keep within the allotted sphere of their operations; and not to believe, that because what is required of them may be convenient or just in itself, it may therefore be done by them. What would be the opinion of the learned judge on this case, we can only conjecture from his past adjudications; and in them there is nothing that directly or by inference bears upon it. It is worthy of remark that in his edition of Abbott on Shipping, the case of Ouston v. Hebden [supra] is twice refered to as authoritative law; and he does not intimate any disapprobation of the decision, or make a suggestion that a different law prevails, or ought to prevail, in the United States. Nor can this be attributed to inadvertence, as he has a note on this subject, in which he refers to the case of Willings v. Blight [Case No. 17,765], and to 2 Browne, Civ. Law, 131.

A few words will suffice for the second or alternative prayer of the complainants, that they shall be permitted to send the brig to sea with a master appointed by themselves;

that is, that the respondent, an equal part owner with themselves, in full and lawful possession of the vessel, shall be wholly dispossessed of her, both as owner and master; and that she shall be put under the exclusive control and power of the petitioners. This has not been, and could not be, strongly insisted upon. It would be an exercise of power beyond even the sale of the vessel, for which no principle or precedent has been shown. In the case of a sale, the proceeds would come into the hands of the court for those concerned; but this application would deprive the respondent of a property, clearly his own, and a possession certainly lawful, to put both into the hands of those whose rights and interests are no greater than his own; and from whom he can have no better security than he is willing to give them. In such circumstances his possession must prevail; and I know of no power in this or in any court to deprive him of it, and transfer it to his co-partners. I mean to decide, only, the case in hand. On the questions, whether a minority shall or shall not be compelled to sell, said, by Judge Peters, to be undecided; or whether a majority refusing to fit out, shall be so compelled; or an equal owner refusing to give stipulations; I am not called upon to give my opinion, more direct than was necessarily incidental to the course of my argument.

On this case it is my opinion and decree, that neither of the prayers of the petitioners can be granted, and that their petition be dismissed with costs; and further that the respondent have leave to send the said brig to sea, first entering into stipulations for the safe return of the same.

[NOTE. Libelants having moved for leave to enter an appeal, the same was opposed by counsel for respondent, but the court, after hearing argument, allowed the appeal to be taken. Case No. 3,651. In the circuit court the decree was reversed, and the power and duty of admiralty courts to order a sale under such circumstances was sustained. Id. 12,-670.]